**Denise SKOMO, Appellant,**

v.

**Timothy SKOMO, Appellee.**

Superior Court of Pennsylvania.

Submitted Nov. 17, 2003.

Filed March 4, 2004.

Harold B. Fink, Jr., Port Allegany, for appellant.

Jarett R. Smith, Coudersport, for appellee.

Before: ORIE MELVIN, OLSZEWSKI, and POPOVICH, JJ.

OPINION BY OLSZEWSKI, J.:

¶ 1 As with most interstate custody disputes, the factual tapestry of this case is fairly intricate. With that said, the facts are as follows.

¶ 2 Denise and Tim Skomo (appellant and appellee, respectfully) were married in 1998. Out of their union, one child, Ryan Skomo, was born on May 14, 1999, in Kansas. Throughout this time and until July 2001, the family lived together in Kansas. In July 2001, however, the parties separated; and at the same time, Denise and young Ryan left Kansas to live in Pennsylvania. They have been living in this state ever since; Tim Skomo has continued to, and currently does, live in Kansas.

¶ 3 On October 22, 2001 (three months after Denise and Ryan left Kansas), Tim Skomo filed a petition for divorce and child custody in the Kansas courts. By order of April 22, 2002, the District Court of Geary County, Kansas, entered a valid divorce decree that also: granted joint custody over Ryan with a corresponding custody and visitation schedule, ordered Mr. Skomo to pay child support, and settled any property disputes between the former couple.

¶ 4 When the time came for Mr. Skomo to have custody over Ryan, Denise moved back to Kansas and stayed there until Mr. Skomo's scheduled custody time expired. Thus, for about three months Ms. Skomo lived and worked in Kansas. After this time, both Ms. Skomo and Ryan moved back to Pennsylvania.[1]

¶ 5 Why our court system has this case is because of what follows. On June 11, 2002, Denise Skomo filed a complaint for custody over Ryan in the Court of Common Pleas of Potter County, Pennsylvania. The Pennsylvania court, apparently unaware that a custody order was already in

---

1. Whether this stay in Kansas amounted to a change in residency for Ms. Skomo was vigorously argued by the parties. Further, we have diverse findings on this issue by the two state courts: the Kansas court seemingly found that Ms. Skomo did change her resi- dency during this time; the Pennsylvania court found that she did not. While our discussion will assume that Ms. Skomo did not change her residency, this question is really immaterial to the jurisdictional question at hand.

place, ordered mediation between Denise and Tim Skomo.

¶ 6 Two days later, Denise Skomo filed an emergency petition to modify visitation in that same Pennsylvania court, seeking to suspend Mr. Skomo's visitation rights. While this latter petition was denied because Ms. Skomo did not produce the visitation order, she filed another petition to modify visitation in Pennsylvania on September 26, 2002. The lower court then granted Ms. Skomo's petition to modify.

¶ 7 After conferring with Judge Steven Hornbaker, the District Judge of Geary County, Kansas, however, the Pennsylvania lower court judge vacated its prior orders. The court found that jurisdiction over this custody matter lies in Kansas, not Pennsylvania. In response, Ms. Skomo filed a motion to reconsider. This was granted. On March 13, 2003, testimony was heard in Potter County, Pennsylvania, concerning whether Pennsylvania had jurisdiction over this affair. The trial court found that the Federal Parental Kidnapping Prevention Act (28 U.S.C.A. § 1783A) prevented our courts from modifying the initial Kansas custody order. It thus held that Pennsylvania does not have jurisdiction and could not hear the case. Ms. Skomo now appeals that determination.

¶ 8 During this time, Mr. Skomo was also active in the courts. In October 2002, Mr. Skomo petitioned the Kansas district court for unilateral custody over Ryan. The Kansas court granted this motion and required Denise Skomo to immediately surrender physical custody of Ryan to Mr. Skomo. She is denied any parental time with her son until she applies for visitation in the Kansas court.

¶ 9 This appeal asks whether the Pennsylvania courts have the power to hear Ms. Skomo's petitions to modify custody. We conclude that our courts do not have this power.

## ANALYSIS

¶ 10 Prior to the Uniform Child Custody Jurisdiction Act (the UCCJA), custody jurisdiction across the United States was a mess. As our Supreme Court has noted, initial child custody orders were "routinely modified by non-issuing States, despite the dictates of the full faith and credit clause." *In re Adoption of N.M.B.*, 564 Pa. 117, 123, 764 A.2d 1042, 1045 (2000). This stemmed from the fact that child custody orders are never really "final." Our paramount concern is the "best interests of the child," and we are required to modify such orders when the child's best interests require they be modified. *Choplosky v. Choplosky*, 400 Pa.Super. 590, 584 A.2d 340 (1990).

¶ 11 Without uniform nationwide laws, states continually stepped upon the child custody determinations of other states. This was usually initiated when a parent (usually the non-custodial parent) would be dissatisfied with the first child custody determination. This parent would then snatch their child and abscond to another state. In this new state, the parent would argue that circumstances have changed, necessitating a modification of the original child custody order. All that was needed was physical presence of the child.

¶ 12 It is not hard to see that this backdoor manner of child custody modification was detrimental to everyone and everything: it encouraged nasty behavior by parents; children were being kidnapped; relitigation was prevalent; state relations were harmed; custody arrangements were unstable; and forum shopping was occurring on a daily basis.

¶ 13 The UCCJA attempted to rectify this mayhem. As Pennsylvania's version of the UCCJA states, its purposes are to:

(1) Avoid jurisdictional competition and conflict with courts of other states in

matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being.

(2) Promote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child.

(3) Assure that litigation concerning the custody of a child takes place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning his care, protection, training and personal relationships is most readily available, and that courts of this Commonwealth decline the exercise of jurisdiction when the child and his family have a closer connection with another state.

(4) Discourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child.

(5) Deter abductions and other unilateral removals of children undertaken to obtain custody awards.

(6) Avoid relitigation of custody decisions of other states in this Commonwealth insofar as feasible.

(7) Facilitate the enforcement of custody decrees of other states.

(8) Promote and expand the exchange of information and other forms of mutual assistance between the courts of this Commonwealth and those of other states concerned with the same child.

23 Pa.C.S. § 5342.

¶ 14 These purposes, however, were almost thwarted because "some States refused to enact the UCCJA and many others enacted it with their own modifications." *In re Adoption of N.M.B.,* 564 Pa. at 123, 764 A.2d at 1045. The old regime that created "incentives to move children across State borders in an effort to obtain a more favorable custody determination" was thus still prevalent. *Id.*

¶ 15 In 1980, Congress finally got into the action by passing the federal Parental Kidnapping Prevention Act (PKPA). 28 U.S.C. 1738A. This Act sought to promote the same interests as stated in Pennsylvania's UCCJA; and since every state is bound by the PKPA, the above purposes can be fulfilled. Further, because the PKPA is federal law, the Supremacy Clause of the United States Constitution requires that it be given primacy over our UCCJA. *Kriebel v. Kriebel,* 571 Pa. 356, 360, 812 A.2d 579, 582 (2002).

¶ 16 We must therefore read our UCCJA consistently with and in conjunction with the PKPA. Thus, even though Pennsylvania might now be the "home state" of Ryan under the UCCJA, giving our Courts preliminary jurisdiction over this child custody case, this does not end the discussion. A child custody determination already exists *per* the April 22, 2002, Kansas order which granted joint custody over Ryan and set forth a custody and visitation schedule for the parties. Ms. Skomo now wishes that the Commonwealth's courts will modify the Kansas visitation order; we must first look to the PKPA to determine whether we are empowered to do so.

¶ 17 The PKPA tells us that if the Kansas custody and visitation determination was "made consistently with the provisions of" the PKPA, it may not be modified by any other state unless certain conditions are met. 28 U.S.C. § 1738A(a). We will first see whether the April 22 order was valid under the PKPA.

¶ 18 As 28 U.S.C.S. § 1738A(c) states:

(c) A child custody or visitation determination made by a court of a State is

consistent with the provisions of this section only if—

    (1) such court has jurisdiction under the law of such State; and

    (2) one of the following conditions is met:

        (A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State.

¶ 19 Kansas statute § 38–1348 declares that a Kansas court has "jurisdiction to make an initial child-custody determination" if Kansas was the "home state of the child within six months before the commencement of the proceeding and the child is absent from [Kansas] but a parent or person acting as a parent continues to live in [Kansas]." K.S.A. § 38–1348(a)(1). "Child-custody determination" includes orders for both legal and physical custody as well as visitation orders. K.S.A. 38–1337(4).

¶ 20 As to what the term "home state" means (as used in both the Kansas statute and the PKPA), the Kansas legislature has defined the term using almost identical language to the PKPA. As the PKPA declares, "home State" means:

the State in which, immediately preceding the time involved, the child lived with his parents, a parent or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old, the State in which the child lived from birth with any of such persons. Periods of temporary absence of any of such persons are counted as part of the six-month or other period.

28 U.S.C. § 1738A(b)(4).

¶ 21 The April 22, 2002, custody and visitation determination was commenced by Mr. Skomo on October 22, 2001: this was when Mr. Skomo filed a petition for divorce and child custody in the Kansas courts. While both Ryan and Ms. Skomo left Kansas three months prior to October 22, Ryan, Ms. Skomo and Mr. Skomo had lived together in Kansas for years up until the separation. Thus, Kansas "had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons." 28 U.S.C. § 1738A(c)(2)(A)(ii); accord K.S.A. § 38–1348(a)(1). Further, Mr. Skomo did and does continue to live in the state of Kansas. The Kansas court therefore had jurisdiction to make the initial custody and visitation determination under 28 U.S.C.S. § 1738A(c).

¶ 22 Since the initial Kansas child-custody determination was valid under the PKPA, no other state may modify this determination unless (among other reasons) that state has jurisdiction to make the child custody determination and "Kansas no longer has jurisdiction, or it has declined to exercise such jurisdiction to modify" the determination. 28 U.S.C. § 1738A(f).

¶ 23 We have already assumed that the Commonwealth was Ryan's "home state" when Ms. Skomo filed her petition to modify the custody determination. We must now ask whether Kansas still has jurisdiction over this matter.

¶ 24 The PKPA declares that the state which made an initial child-custody determination continues to have jurisdiction over the affair "if the initial decree complied with the PKPA at the time the de-

cree was rendered; if under that other State's law, the State maintains jurisdiction over the decree; and, the other State remained the residency of any of the parties at the time of the Pennsylvania proceeding." *In re Adoption of N.M.B.*, 564 Pa. at 129, 764 A.2d at 1048.

¶ 25 As we have stated above, the initial decree did indeed comply with the PKPA's mandates. Further, Mr. Skomo continues to live and reside in Kansas. Thus, the only thing left to determine is whether under Kansas law, Kansas still has jurisdiction over the decree. Under K.S.A. § 38–1349, when a Kansas court has made a valid "child-custody determination", Kansas has "exclusive, continuing jurisdiction over the determination until:

(1) A court of [Kansas] determines that neither the child, the child's parents, and any person acting as a parent do not have a significant connection with this state and that substantial evidence is no longer available in [Kansas] concerning the child's care, protection, training, and personal relationships; or

(2) a court of [Kansas] or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in [Kansas].

K.S.A. § 38–1349(a).

¶ 26 In this case, no Kansas court has made the determination needed in § 38–1349(1). Further, Mr. Skomo does still live in Kansas, thus satisfying § 38–1349(2). Therefore, Kansas does still have "exclusive, continuing jurisdiction" over this child-custody determination.

¶ 27 As to whether Kansas has "declined to exercise such jurisdiction to modify" the determination, the exact opposite is true. During the Pennsylvania proceedings, the Commonwealth's judge spoke with the Kansas judge numerous times by telephone. At all times, the Kansas judge

declared that Kansas retains jurisdiction over this matter.

¶ 28 At this time it is Kansas, not Pennsylvania, where Ms. Skomo must petition the court for modification of the child custody determination.

¶ 29 Order AFFIRMED.